IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


MATTHEW J. LUPER                                                         PLAINTIFF

            v.                         Civil No. 08-2092

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                          DEFENDANT

### MEMORANDUM OPINION

**Factual and Procedural Background**:

Plaintiff, Matthew J. Luper, appeals from the decision of the Commissioner of the Social Security Administration (Commissioner) denying his applications for disability insurance benefits (DIB) and supplemental security income benefits (SSI), pursuant to §§ 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a, respectively (collectively, "the Act").

At the time of the administrative hearing, Plaintiff was thirty three years of age and possessed the equivalent of a high school education. He performed past relevant work as an electronics repair helper/installer. (Tr. 12). In Plaintiff's applications for DIB and SSI, he alleged a disability onset date of April 30, 2003, due to post traumatic stress disorder (PTSD), psychosis, and depression stemming from an incident where Plaintiff was brutally beaten with a golf club.[1] (Tr. 11, 122). As a result of the beating, Plaintiff sustained several injuries, including a fractured distal radial ulnar joint (left), requiring open reduction and internal fixation with a plate

---

[1] There appears to be some inconsistency in the record regarding the alleged disability onset date, April 30, 2003, and the date of the beating, June 26, 2004. (Tr. 231).

and primary bone graft.  (Tr. 239).  At Plaintiff's hearing, he alleged residual pain associated with

this injury and with an unrelated vertebral compression fracture at T11/12 sustained when Plaintiff

fell from a telephone pole in 2002.[2]  (Tr. 212).

Plaintiff filed his DIB and SSI applications on July 14, 2006.  (Tr. 100, 103).   His

applications were denied at the initial and reconsideration levels.  (Tr. 63, 66, 72, 74).  At Plaintiff's

request, an administrative hearing was held on September 14, 2007.  (Tr. 7).  The Administrative

Law Judge (ALJ) rendered an unfavorable decision on January 15, 2008, finding that Plaintiff was

not disabled within the meaning of the Act because he was capable of performing one or more

occupations existing in significant numbers in the national economy.  (Tr. 53-62).  Subsequently,

the Appeals Council denied Plaintiff's Request for Review on July 2, 2008, thus making the ALJ's

decision the final decision of the Commissioner.  (Tr. 1).  Plaintiff now seeks judicial review of that

decision.

**Applicable Law:**

The Court's role on review is to determine whether the Commissioner's findings are

supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583

(8th Cir. 2003).  "Substantial evidence is less than a preponderance, but enough so that a reasonable

mind might accept it as adequate to support a conclusion."  *Estes v. Barnhart*, 275 F.3d 722, 724 (8th

Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)).  In determining whether

---

[2] Plaintiff did not allege wrist and back pain in his application for disability benefits. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (Plaintiff's failure to allege an impairment in her application for disability benefits was significant).  Furthermore, Plaintiff agrees that this is a case "involving primarily psychologically based impairments."  *See* Pl.'s Br. 3.  For these reasons, the Court finds substantial evidence to support the ALJ's determination that Plaintiff's wrist and back impairments are not "severe" and do not support a determination of disability.

evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity (RFC) to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

**Discussion**:

Plaintiff does not contest the ALJ's findings that: (1) Plaintiff has not engaged in substantial gainful activity since April 30, 2003; (2) Plaintiff suffers from depression, PTSD, personality disorder, and substance abuse disorder in remission, which, in combination, limit his ability to meet the psychological demands of work; (3) Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1; and (4) Plaintiff is unable to perform his past relevant work as an electronics repair helper/installer. However, Plaintiff contends that the ALJ improperly determined the Plaintiff's RFC by failing to give substantial weight to the treating physician's opinion, by relying too heavily on the DDS' evaluation, and by failing to consider the vocational expert's (VE's) testimony concerning the Plaintiff's ability to perform substantial gainful activity. *See* Pl.'s Br. 4-12. Upon review, the Court finds that the ALJ's determinations regarding the first three steps of the five-step evaluation process are supported by substantial evidence. However, the Court finds that the ALJ erred as to step four of the process.

At the fourth step of the evaluation, a disability claimant has the burden of establishing his RFC. *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Masterson*, 363 F.3d at 737. The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be

-4-

"some medical evidence" to support the ALJ's determination.  *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

      With respect to Plaintiff's RFC, the ALJ found the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels.  He is, however, limited to performing work where interpersonal contact is incidental to the work performed (e.g. assembly work), the complexity of tasks is learned and performed by rote with few variables and little judgment and the supervision required is simple, direct and concrete.

(Tr. 58).

      Plaintiff argues that the ALJ, in determining Plaintiff's RFC, accorded too little weight to the treating physician's opinion and too much weight to the opinion of a consultative physician.  A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a clamant's record.  *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2).  The record must be evaluated as a whole to determine whether the treating physician's opinion should be controlling.  *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).  A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Id.* at 920-21 (quoting *Prosch*, 201 F.3d at 1013).  In any case, an ALJ must always "give good reasons" for the weight afforded to the treating physician's opinion.  20 C.F.R. § 404.1527(d)(2).

      The ALJ stated his reasons for disregarding the opinion of Dr. Donald Chambers, Plaintiff's treating physician, as follows:

> Upon assessing the severity of the claimant's functional limitations, the undersigned did  consider the opinion evidence offered by his treating psychiatrist, Dr. Donald Chambers, M.D.  The undersigned finds Dr. Chamber's assessment of marked functional limitations to be inconsistent with the objective medical evidence of record as whole [sic] as well as with his own statements, as noted above, that the claimant as of September 2006, after initiating treatment, had experienced a significant improvement in his condition (Exhibit 12F-4).

(Tr. 57-59).  Furthermore, the ALJ explained why he afforded greater weight to the opinion of

 Dr. Jerry Henderson, a DDS consultant:

> Upon assessing the claimant's residual functional capacity substantial weight has been given to the opinion evidence offered by Jerry R. Henderson, Ph.D., a State Disability Determination Service medical consultant, who, upon completing a residual functional capacity assessment at the administrative level, finds the claimant to be moderately limited in his ability to: maintain focus and concentration; understand, remember and carry out detailed instructions; work in proximity to others; respond appropriately to criticism and changes in the workplace; set realistic goals; sustain an ordinary routine and perform at a consistent pace (Exhibit 9F).  Dr. Henderson's assessment of the severity of the claimant's limitations, as noted above, is found to be consistent with the objective medical evidence of record as a whole.

(Tr. 60).

    After reviewing Plaintiff's medical history in conjunction with the opinions of Dr. Chambers and Dr. Henderson, the Court finds that the ALJ's denial of benefits is not supported by substantial evidence of record.  In discounting Dr. Chambers' RFC, the ALJ stated that Dr. Chambers' evaluation was inconsistent with the objective medical evidence as a whole.  (Tr. 57).  However, with the exception of one short-lived period of improvement in September 2006, the overwhelming medical evidence indicates that Plaintiff consistently suffered from symptoms associated with his diagnoses, for which medication provided little long term relief.

    Plaintiff's records reveal a history of treatment for mental illness, beginning at adolescence. As a teenager, Plaintiff was hospitalized at Sparks Regional Medical Center on three separate

occasions for severe depression, substance abuse (marijuana), and suicidal ideation. (Tr. 170, 175, 182). In addition to depression and suicidal thought, Plaintiff experienced occasional hallucinations/disorientation, nightmares, and significant sleep disturbances. (Tr. 170-72, 175, 182). He was diagnosed with major depression. (Tr. 176, 185). During the course of his treatment, Plaintiff was prescribed several medications, including Prozac[3], Amitriptyline[4], and Imipramine[5].

On his initial intake report at Western Arkansas Counseling and Guidance Center (WACGC) in 2006, Dr. Jerry Stearman, a licensed psychological examiner, noted that Plaintiff was suffering from "extreme depression" and "has completely withdrawn." (Tr. 245). "He completely stays isolated and apparently does not watch TV, listen to the radio, or any other activity." (Tr. 245). Dr. Stearman further noted that Plaintiff was "very depressed, tearful, and crying throughout most of the interview. He presents very hopeless and apathetic about life . . . he seems to have no goals or objectives and has a total dark picture of his life and future." (Tr. 246). Based on these facts, Dr. Stearman diagnosed Plaintiff with major depressive disorder, recurrent, severe, with psychotic features and personality disorder. (Tr.247). During the course of his treatment, Plaintiff was

---

[3] Prozac is a psychotropic drug most commonly used for treatment of depression. PHYSICIANS' DESK REFERENCE (PDR), 1801-02 (61st ed. 2007).

[4] Amitriptyline (generic for Elavil) is a combination drug used to treat patients with nervousness and/or agitation and depressed mood. PDRhealth, http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=ami1456.html&contentName=Amitriptyline+hydrochloride+and+perphenazine&contentId=55=55 (last visited Oct. 28, 2009).

[5] Imipramine (generic for Tofranil) is used to treat depression. PDRhealth, http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=tof1448.html&contentName=Tofranil%2fTofranil-PM&contentId=768 (last visited Oct. 28th, 2009).

-7-

prescribed Seroquel[6] and Cymbalta.[7]  Medication and individual therapy had limited success.  (Tr. 245-64, 291-300).  Dr. Stearman consistently noted Plaintiff's depression, social avoidance, and sense of hopelessness.  (Tr. 252, 255, 291-92).  Throughout his treatment, Plaintiff's GAF score ranged between 40-45.[8]  (Tr. 247, 250, 258, 294-95).  Dr. Stearman's progress notes stated that Plaintiff "seemed to be getting little relief from medication", "had made little improvement in mood or daily living and remained isolated", "seemed to be in the throws of a major depressive episode", and "needs to return to therapy if he is not improved."  (Tr. 296, 300).

Following treatment at WACGC, Plaintiff initiated treatment with Dr. Donald Chambers, M.D.  On July 3, 2006, Dr. Chambers noted in his initial evaluation that he "wasn't really certain that he [Plaintiff] is really interested in treatment as he is more interested in getting application in for disability."[9]  (Tr. 310).  Despite this initial comment, Dr. Chambers evaluated and diagnosed Plaintiff with severe PTSD stemming from the golf club incident, noting that "a major affective difference was generated in him from this beating and he has not been able to be productive since."

---

[6] Seroquel is an antipsychotic drug used for treatment of bipolar disorder and schizophrenia.  PDR, *supra* note 3, at 690-91.

[7] Cymbalta is indicated for the treatment of major depressive disorder (MDD).  *Id.* at 1757-58.

[8] A GAF score of 31-40 indicates "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  A GAF score of 41-50 indicates "serious symptoms or any serious impairment in social, occupational, or school functioning."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (4th ed., 2000).

[9] The ALJ appears to have attached substantial weight to this statement.  Although Dr. Chambers may have expressed doubt at Plaintiff's initial evaluation, he diagnosed, treated, and prescribed medication to Plaintiff for the greater of a year.  (Tr. 265-68, 301-11, 315-28).  The Court finds it highly doubtful that a treating physician would continue to prescribe medication to a patient that had no desire or need for treatment.

(Tr. 306, 309-10).

Dr. Chambers' Medical Source Statement (MSS), dated July 3, 2006, indicated marked limitations in Plaintiff's ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; complete a normal workday or workweek; perform at a consistent pace; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers and peers; maintain socially appropriate behavior; and respond appropriately to changes in the work setting. (Tr. 340-41).  He also noted moderate limitations in Plaintiff's ability to: remember locations and work-like procedures; understand and remember short, simple instructions; carry out short, simple instructions; make simple work-related decisions; ask simple questions or request assistance; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 340-41).  In explaining his findings, Dr. Chambers noted that Plaintiff was "emotionally volatile" and could not "sustain attention or ordinary application to tasks." (Tr. 341).

As part of Plaintiff's treatment, Dr. Chambers prescribed Neurontin[10] and Klonopin.[11]  Two months into treatment, on September 1, 2006, Dr. Chambers' progress notes reveal that Plaintiff was

---

[10] Neurontin is indicated as adjunctive therapy in the treatment of partial seizures.  PDR, *supra* note 3, at 2489.

[11] Klonopin is useful in the treatment of certain types of seizures and panic disorder.  *Id.* at 2778.

-9-

feeling "a good deal better" and that "this one [Neurontin] has kind of hit the spot."  (Tr. 304).  However, although there was a period of notable improvement, Dr. Chambers' subsequent progress notes indicate that Plaintiff may have experienced a resurgence of symptoms.  (Tr. 317-323).  Unfortunately, Most of Dr. Chambers' notes from this period are handwritten and difficult to read.[12]

In determining Plaintiff's RFC, the ALJ afforded substantial weight to Dr. Henderson's evaluation.  In doing so, the ALJ dismissed the medical opinions of Dr. Chambers and Dr. Stearman.  Generally, the assessment of a doctor who evaluates a plaintiff once or not at all does not constitute substantial evidence, especially if the treating physician contradicts the consulting physician's opinion.  *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999); *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004).  However, "an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment."  *Id.*; *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004).

Dr. Henderson's RFC, dated September 17, 2006, stated that Plaintiff suffers from moderate limitations, but is able to perform work where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote, there are few variables and little judgment, and the supervision required is simple, direct and concrete.  (Tr. 275).  This evaluation differed from Dr. Chambers' MSS, which indicated marked limitations in several areas of functioning, and is inconsistent with the medical entries of Dr. Stearman at WACGC.  (Tr. 340-41).  Furthermore, Dr. Henderson never stated the evidence on which he based his conclusions or provided an adequate explanation for his findings.  For these reasons, the Court finds that it was error to attach substantial

---

[12] On remand, the Court strongly advises that interrogatories be directed toward Dr. Chambers to aid in understanding his progress notes.

weight to the opinion of Dr. Henderson.  *See Woodward v. Schweiker*, 668 F.2d 370, 374 (8th Cir. 1981)(reports of non-treating physicians deserve little weight in the overall evaluation of disability, especially in light of evidence to the contrary).

**Conclusion**

Accordingly, the ALJ's decision denying benefits to Plaintiff is not supported by substantial evidence and should be reversed.   This matter should be remanded to the Commissioner for reconsideration of the issue of Plaintiff's RFC, based on all relevant evidence, including medical records, opinions of treating medical personnel, and Plaintiff's description of his own limitations.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). Upon remand, interrogatories should be directed to the treating physicians, to aid in the proper determination of Plaintiff's RFC.  Once a proper assessment is completed, the ALJ should also reconsider whether Plaintiff's RFC allows him to engage in substantial gainful employment.

ENTERED this 6th day of November, 2009.

/s/ J. Marschewski
HONORABLE JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE